746 So.2d 622 (1999)
Johnny WINSTON
v.
FLAMINGO CASINO.
No. 99-CA-0209.
Court of Appeal of Louisiana, Fourth Circuit.
September 22, 1999.
*623 Johnny Winston, Mer Rouge, in proper person, Plaintiff/Appellant.
John E. Maher, Jr., Law Office of Raymond P. Augustin, Jr., Metairie, Counsel for Defendant/Appellee.
Court composed of Judge JAMES F. McKAY III, Judge DENNIS R. BAGNERIS Sr., Judge ROBERT A. KATZ.
BAGNERIS, Judge.
This appeal arises out of suit for damages for personal injuries allegedly sustained by Plaintiff-Appellant, Johnny Winston (Winston) due to an alleged slip and fall on steps leading to the Flamingo Casino. The trial court granted Defendant-Appellee Flamingo Casino's (Flamingo) Motion for Involuntary Dismissal, finding that Winston failed to establish a prima facie case of negligence on the part of the Flamingo.
On appeal, Winston alleges that the trial court committed manifest error in the following ways: in refusing to issue a Writ of Attachment to compel the presence of witness Beatrice Coast; in disallowing the testimony of witness Calvin Douglas; in refusing to compel the Flamingo to produce witness Derek Douglas; in quashing the subpoena of witness Tim Dobson; in denying Winston's Motion to Be Transported from prison to the site of the alleged fall in order to take photographs.
After a thorough review of the record, this Court finds that the trial court's findings are not manifestly erroneous or clearly wrong and are reasonably supported by the record. For these reasons, the judgment of the trial court is affirmed.

STATEMENT OF FACTS
Winston alleges that on his way to gamble in the Flamingo on December 13, 1995, he sustained injury when he slipped and fell on the stairwell leading to the Flamingo's entrance. Trial on this matter was held in open court before a trial judge on April 1 and April 2, 1998. There was no jury. Winston appeared pro se.
In ruling against Winston, the trial judge, in her oral reasons for judgment, concluded that Winston failed to make a prima facie case. The trial judge further stated that Winston "didn't meet his burden of proof." Based on these reasons, the trial judge granted the Flamingo's Motion for Involuntary Dismissal with prejudice.

*624 LAW AND DISCUSSION

A. Involuntary Dismissal and Standards of Review

Trial Court
LSA-C.C.P. art. 1672 B provides as follows:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all evidence.
Such a motion should be granted only "when the plaintiff has failed to establish his case by a `preponderance of the evidence.'" Haworth v. L'Hoste 664 So.2d 1335, 1339 (La.App. 4 Cir.1995) citing Webb v. Smith, 555 So.2d 556, 557 (La. App. 4th Cir.1989). The plaintiffs' burden of proof in a civil case is by a preponderance of the evidence: all evidence, direct and circumstantial, taken as a whole must show that the causation or fact sought to be proved is more probable than not. Sonnier v. Bayou State Mobile Homes, Inc., 692 So.2d 698, 700 (La.App. 3 Cir. 4/2/97); Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (La.1971).

Appellate Court
In Morgan v. City of New Orleans, 94-0874 (La.App. 4 Cir. 12/15/94), 647 So.2d 1308, 1310, writ denied 95-0150 (La.3/30/95), 651 So.2d 859, this Court set out the relevant criteria for review of a trial court judgment granting this motion:
1. The judge must weigh and evaluate all the evidence presented to that point and determine whether the plaintiff established a prima facie case by a preponderance of the evidence.
2. Unlike a motion for directed verdict in a jury trial, the trial judge reviews the evidence without any special inference favorable to the party opposed to the motion.
3. A dismissal under Article 1672(B) should not be reversed absent manifest error.
In our review of the trial court's conclusions, we apply the manifest error standard.
"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong...[A]ppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo...When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said...[Where] a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
We are instructed that before a finding may be reversed, we must find from the record that a reasonable factual basis does not exist for the finding, and that the record establishes that the finding is manifestly wrong. Lewis v. State[, T]hrough Dept. of Transp. and Development, 94-2370 (La. 4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts, not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine *625 whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Ambrose v. New Orleans Police Department Ambulance Service, 639 So.2d 216, 221 (La.1994).
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access to only a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
We find that the record furnishes reasonable factual basis for the trial court's findings. Garry Roark is a security guard employed by the Flamingo. Roark testified that he prepared the accident report in connection with this alleged accident. Roark testified that the accident occurred on December 13, 1995 at approximately 11:55 p.m. Roark testified that he did not witness the accident personally. Roark testified that Derek Lewis, a former security guard at the Flamingo, called him to the "gangway" on the evening of December 13, 1995. Lewis directed Roark to "a black male, 5'11", 260/270 pounds...who identified himself as Johnny Williams." Roark testified that "Mr. Williams stated that he had fallen on the stairs." Roark testified that Winston refused to cooperate in assisting with the accident report. Winston refused to give the following information: his address; his social security number; his driver's license number; his home telephone number; and his business telephone number. Roark testified that Winston also refused any assistance. Roark testified that Winston's appearance did not exhibit any visible signs of a fall in that his clothing was not ripped, torn, dirty or disheveled, which "would be conducive to a fall, especially onto concrete stairs."
Roark prepared the accident report with the assistance of Derek Lewis and Tim Dobson, a paramedic who arrived at the scene of the alleged accident to provide possible assistance to Winston. Roark testified that Lewis assisted in the preparation of the report because the accident apparently happened at or about the time that Lewis was there. Roark did not testify that Lewis witnessed the actual accident. Roark further testified that Lewis is no longer employed by the Flamingo.
Roark further testified about the steps in question. Roark testified that each step on the stairwell is about two and a half feet long and almost about a foot wide. He testified that each step is made of concrete that is roughened. Roark further testified that on top of this concrete, at the leading edge of the step is a non-skid bar that is approximately an inch wide with "non-skid material on it." Roark testified that these steps were built that way. When asked about the maintenance of the steps, Roark testified that the steps are swept, but they are not mopped because they "are not made to be mopped." Roark also testified that when he examined the steps that evening, he did not find any visible water or damage to any of the steps on the stairwell. Roark further testified that it is usually uncommon around the time in the evening in which the accident occurred for it to be foggy.
*626 Dominick Varrecchio is an attorney. Varrecchio testified that he met Winston some months before the accident in question. Varrecchio testified that he also met with Winston on the day after the alleged accident. Varrecchio testified that Winston told him that he fell on steps at the Flamingo. Varrecchio testified that Winston specifically told him that he "was closer to the bottom of a series of steps, and then fell at that particular time." Varrecchio further testified that Winston told him that the steps were damp, and he fell forward on his hands and knees. Varrecchio also testified that he specifically asked Winston about the exact time of the accident for the purposes of prescription. Varrecchio testified that he and Winston signed a contract of representation on that date. Varrecchio testified that he did not file a suit on Winston's behalf because Winston left town and later informed him that he would file his own suit.
Varrecchio testified that he is familiar with the steps in question. Varrecchio testified that he recalled the steps to be stainless steel steps with "maybe...some concrete involved." Varrecchio testified that he "noticed that there was a lack of good footing on those particular steps." Varrecchio also testified that the steps "would be wet more than half the time I'd walk on them, even whether it rained or not." Defense counsel provided photographs of the steps, which matched the description provided earlier by Roark. When confronted with these pictures, Varrecchio admitted that defense counsel's pictures did appear to show the steps in question. He noted that he could "tell from the hand railing because there's a distinctive hand railing at that particular location, which is a stainless steel chrome silver colored hand railing..."
Frederick Moore testified that he was an inmate at the Elaine Hunt Correctional Center. Moore testified that he was incarcerated for the distribution of cocaine. Moore testified that he was incarcerated with Winston in the Morehouse Parish Jail from August 1996 to January 1997. Moore testified that he was Winston's bed partner during this time of incarceration. Moore testified that he remembered Winston constantly complaining about having sharp and tingling pain in his right leg. Moore testified that he remembered Winston making more than one sick call on his injured leg, as well as Winston's failure to participate in any sports while incarcerated. Moore further testified that he also recalled Winston having "a lot of migraine headaches."
Debbie Scriber is a Registered Nurse employed at the Wade Correctional Center. Scriber testified that she is the Director of Nurses at this facility. After reviewing Winston's records from the facility, Scriber testified that the records indicated that Winston complained about his right leg on two occasions: August 24, 1996 and August 15, 1997. Scriber denied that she had any notes indicating that Winston was suffering with any type of fluid build-up on his legs. Scriber testified that upon Winston's intake at Wade Correctional Facility, he was given a duty status with the following restrictions: "limit your walking to a quarter of a mile... limit your repetitive bending, stooping, and lifting ... limit your lifting to ten pounds ....you were not to participate in any sports." Scriber testified that Winston was given three different duty statuses while at the facility. Her testimony indicated slight improvements and lifting of some of the earlier restrictions placed on Winston.
Johnny Winston testified last. Winston testified that the accident took place on December 13, 1995, between 5 and 7 p.m. This conflicted with the testimony of Roark, who testified that the accident took place at 11:55 p.m. When confronted with this discrepancy, Winston denied that he had ever seen Roark, much less spoke to him. Winston testified that Roark's testimony was "fabricated". Interestingly, Winston testified that one of the factors that contributed to his accident was the *627 fact that the Flamingo failed to provide lighting around the stairwell at the time of his accident. Winston testified in this regard as follows: "At night, midnight, there's no lighting around that area at all." This is interesting because this testimony seems to indicate that the alleged accident occurred closer to the 11:30 p.m. time given by Roark, as opposed to the time between 5 and 7 pm given by Winston.
Winston testified that he was entering the stairwell approaching the Flamingo when he slipped and fell on the steps. In describing how he fell, Winston initially stated that his right foot slipped out from under him as he was descending the stairs. Winston later changed his testimony and stated that he lost his balance with his right foot and "also slipped on further with my left foot." Winston testified that he was holding on to the left rail as he was descending the steps, but he fell despite this because of the fact that the steps were wet due to fog. Winston testified that he could not see that the steps were wet because of the poor lighting around the area. Winston testified that he fell onto his hands and knees.
Winston testified about the steps in question. He described the steps as "shiny, stainless steel steps with no type of grating whatsoever." When confronted with the defense counsel's pictures of concrete steps with a non-skid strip, Winston stated that the non-skid strip on these steps was added after the accident and that the defense counsel's pictures did not accurately reflect the condition of the steps on the date of the accident. Winston also claimed that the photos provided were not pictures of the steps in question. Rather, they were pictures of "other" steps. This conflicts with the testimony of Roark and Varrecchio, who both testified that the photographs depicted the steps where Winston allegedly fell.
Winston further testified that a security guard by the name of Derek Lewis saw him as he fell to his knees. Winston also claimed that another un-named casino patron saw him fall. Additionally, Winston claimed that "a few friends" witnessed the accident. Winston stated that his friends "George" and "Melanie" witnessed the accident. Winston testified that "George" and "Melanie" were unable to testify on his behalf because he was "not able to get their address to get in touch with them or subpoena them ..."
Winston testified that after his fall, Lewis rushed over to him and called paramedic Tim Dobson on his radio. Winston stated that Dobson asked him if he was hurt, and he told Dobson that he "felt okay." Winston further testified that he gave Lewis his name and then proceeded to limp into the casino, where he gambled for a couple of hours. Winston testified that Dominick Varrecchio was present at the casino on this evening, and he spoke to him. Winston noted that "He (Varrecchio) did not recall yesterday when he testified the time in which I spoke to him, but that was the time." Varrecchio testified that he did not meet with Winston until December 14, 1995, the day after the alleged accident. On this date, Winston allegedly told Varrecchio that he was having problems with his legs, neck, back and knees. Winston denied that he had any conversation with Varrecchio regarding the exact time of the accident. This contradicts Varrecchio's testimony that they did discuss the time for purposes of prescription. Winston testified that Varrecchio referred him to a chiropractor by the name of Dr. Malina, with whom Winston treated at least three or four times a week until he was incarcerated.
With regard to his incarceration, Winston testified that he was in jail for writing a worthless check. Winston stated that he had been in jail since January 15, 1996. Winston testified that he saw different medical personnel while he was incarcerated. He testified that he was referred to a Dr. Rocker, with whom he visited on February 20, 1996. Winston testified that Dr. Rocker performed a series of tests. Winston claimed that Dr. Rocker was looking *628 for a pre-existing condition. Winston further claimed that all of the tests turned out to be negative, "And that right there showed that there was no pre-existing condition..." Winston testified that these tests were conducted well before another slip and fall incident that occurred on August 8, 1996, while he was incarcerated at Morehouse Parish Jail. Winston denied that these tests had anything to do with this other alleged slip and fall because they were conducted before the other slip and fall took place.
Winston testified that as a result of the alleged slip and fall at the Flamingo, he sustained back and leg injuries. He further testified that he suffers headaches as a result of this accident. Winston testified that, as a result of this alleged accident, he cannot work, and he cannot play sports. Winston also testified that he is 5'11" and weighs 305 pounds. He stated that he weighed the same amount at the time of the alleged accident. Winston denied that the fluid build-up's in his legs had anything to do with his weight.
These were the only people who testified at the trial. After Winston's testimony, defense counsel made a motion to dismiss. Judge Nadine Ramsey granted the motion, stating as follows:
"At this time I'm going to grant the defense motion to dismiss the case. I don't believe that Mr. Winston made a prima facie case. I have his uncorroborated testimony regarding the accident which was in direct conflict with what the security officer testified to, and I find that Mr. Winston didn't meet his burden of proof. So I'm going to dismiss the action."
After a thorough review of the record, we find that a reasonable factual basis does exist for the trial judge's finding. Winston's testimony conflicted with that of Garry Roark, the security guard who prepared the accident report. Winston's testimony also contradicted that of his own witness, Dominick Varrecchio. Winston also contradicted himself at times. In addition, Winston did not provide any witnesses to the alleged accident. In short, other than Winston's own testimony, there was no supporting or circumstantial evidence produced by Winston to prove that an accident really even took place.
Thus, viewing the record as a whole pursuant to the standard of appellate review set forth at the outset of this section, we cannot say that the trial court's finding that the plaintiff failed to prove a prima facie case was clearly wrong or manifestly erroneous.

B. Assignments of Error
Winston alleges that the trial court committed manifest error in the following ways: in refusing to issue a Writ of Attachment to compel the presence of witness Beatrice Coast; in disallowing the testimony of witness Calvin Douglas; in refusing to compel the Flamingo to produce witness Derek Lewis; in quashing the subpoena of witness Tim Dobson; in denying Winston's Motion to Be Transported from prison to the site of the alleged fall in order to take photographs.
Louisiana Rule 1-3 of the Uniform Rules of the Courts of Appeal states in pertinent part as follows: "The Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise."
A meticulous review of the record indicates that Winston failed to object to the trial judge's rulings regarding these witnesses and issues. As a result, these issues were not preserved for appeal and are beyond this Court's scope of review. Therefore, these assignments of error are without merit.

C. Frivolous Appeal
Flamingo has answered Winston's appeal requesting sanctions for a frivolous appeal, pursuant to Louisiana Code of Civil Procedure Articles 2133 and 2164 as well as Louisiana Uniform Rules for the Courts *629 of Appeal 2-19. We decline to grant these sanctions.
Appeals are favored and courts are reluctant to grant damages for frivolous appeals. Palm-Air Civic Ass'n, Inc. v. Syncor Intern., Corp., 709 So.2d 258, 263 (La.App. 4 Cir.1998); See Price v. City of New Orleans, 95-1851 (La.App. 4 Cir. 3/27/96), 672 So.2d 1045, 1052-53, writ denied 96-1016 (La. 10/25/96), 681 So.2d 360. In assessing damages for a frivolous appeal, "... it must be manifest that the appeal was taken solely for delay or that appealing counsel does not sincerely believe in the view of law he advocates." Price, supra; Hellpenstell v. Bonnabel Hospital, 523 So.2d 887, 891 (La.App. 4th Cir.1988), writ den. 531 so.2d 282 (La.1988), citing Sherman for and on Behalf of Magee v. B & G Crane Service, 455 So.2d 1275 (La.App. 4th Cir.1984) at 1278.
This Court is reluctant to grant frivolous appeal damages because of the possible negative effect it may have on the appellate process, and we decline to do so in this case.