JjMAX N. TOBIAS, JR., J.
In this personal injury action, the defendant, State of Louisiana, Department of Transportation and Development (“DOTD”), appeals from a judgment in favor of the plaintiff, William W. Rosen. After a review of the record, we affirm the judgment.
On 10 July 1994, Mr. Rosen was traveling westbound on the Pontchartrain Expressway in New Orleans. It was raining. He had left the Westbank, crossed the Crescent City Connection Bridge, and passed the Superdome. At that point, the Expressway changes from an elevated to a ground-level roadway for approximately three hundred feet, then becomes “the south of Broad Street” overpass, proceeds to the Carrollton Interchange, and out to Metairie.
As he was descending the elevated portion, Mr. Rosen lost control of his vehicle and began skidding to the right. In an unsuccessful attempt to gain control, Mr. Rosen jammed on the brakes of his 1984 Nissan Maxima, locked up the wheels, and turned to the left. After skidding about three hundred feet, Mr. Rosen’s vehicle struck the right-hand concrete abutment of the south of Broad Street overpass, which did not have a guardrail. Mr. Ro-sen sustained serious injuries, including a lacerated liver, several broken ribs, and a broken sternum.
|gThe Pontchartrain Expressway was constructed in the mid-1950’s to provide access to the original Greater New Orleans Bridge. As originally constructed, a vertical curve existed on the approach to the bridge with a barrier curve rail in place. Guardrails were not required on bridge abutments under then-existing engineering standards. In 1968, the State of Louisiana adopted minimum highway safety standards with respect to highway design, construction, and maintenance, as promulgated and approved by the American Association of State Highway and Transportation Officials (“AASHTO”). See La. R.S. 48:35. These AASHTO standards provide for guardrails on all bridge abutments.
*503 In March 1994, as part of State Project 283-08-54, the DOTD approved a plan to correct drainage problems in the ground-level portion of the Expressway between the elevated portion and the south of Broad Street overpass. Plan Change 64 was implemented, which changed the road design so that westbound lanes sloped lightly to the outside, causing the water to run off the road to the right. The plan also called for the vertical curve to be replaced with a rollover or mountable curve, which slants more to the curve. Finally, as the work was a reconstruction by DOTD, a guardrail and a guardrail anchor block were to be installed on the right side of the bridge approach to comply with AASHTO guidelines.
At the time of the accident, Plan Change 64 had almost been completed; the new asphalt had been laid and the construction signs had been removed only days earlier. Traffic was now freely traversing the roadway. However, the guardrail was not yet installed because AASHTO guidelines mandate that it be placed at a certain height and spacing above the completed roadway to be most effective. (The guardrail was installed several days after the accident.)
|aThe plaintiff filed suit against the DOTD alleging fault based on negligence and/or strict liability on the grounds, inter alia, that the DOTD allowed vehicle access to an unprotected and unguarded concrete abutment at the edge of a high-speed roadway in violation of applicable safety standards. Subsequently, Time Insurance Company intervened for $36,799.27 in medical benefits it had paid the plaintiff.
The matter was tried without a jury on 12 March 2000. On 14 July 2000, the trial court found in favor of the plaintiff and against DOTD in the amount of $250,000 in general damages and $51,978.78 in special damages, plus interest and costs. The intervenor moved for a new trial because the judgment did not reflect its intervention claim. On 2 October 2000, an amended judgment was issued that recognized the intervenor’s claim.
In its reasons for judgment, the trial court found:
DOTD had knowledge that the bridge end was unsafe since 1968, but failed to discharge its responsibility to provide a safe roadway by correcting the unreasonable hazard that existed at this location due to its internal policy decisions about “major reconstruction” plans. The risk of harm that someone like the plaintiff would collide with the unprotected abutment was within the scope of protection afforded by the duty that DOTD breached. Accordingly, the court finds that DOTD’s breach of duty, rather than plaintiffs loss of control of his vehicle, was the cause-in-fact of the resulting harm.
DOTD appeals, arguing that the plaintiff is at least partly at fault for the accident because driver error contributed to the loss of control of the vehicle. Further, DOTD contends that the testimony of plaintiffs expert, James R. Clary, Sr., should be disregarded because his opinions were unsupported by any facts or documents in evidence, and that they were legal, rather than professional, in nature. In addition, DOTD argues that the plaintiffs expert, Andrew J. McPhate, Dalthough qualified in the field in vehicle dynamics, was improperly allowed to testify to elements of accident reconstruction. DOTD also contends that the trial court erred in denying its motion for involuntary dismissal, urged at the conclusion of the plaintiffs case. In addition, DOTD contends that it was not at fault for failing to have a guardrail in place since 1968 because there had not previously been a major overlay or reconstruction of the sub *504 ject area. And finally, DOTD argues that, in any event, a guardrail would not have lessened the severity of the plaintiffs injuries because he hit the bridge abutment nearly head-on.
Our review of the record indicates that the evidence presented by each side at trial was contradictory. We briefly review the testimony entered in the proceedings below.
Mr. Rosen admitted that he was very familiar with the Pontchartrain Expressway and that the construction project had just been completed. He testified that he lost control of his vehicle coming down off the elevated portion of the highway on the newly laid asphalt. Although it was raining, he did not see any standing water on the road. He testified that the roadway looked like a “black mirror.” He estimated that he was traveling between 40 and 45 miles per hour at the time he lost control.
Mr. Rosen stated that his vehicle began sliding to the right as if he were hydroplaning. He pumped his brakes and turned the wheel to the left to gain control. His attempts were unsuccessful and his vehicle hit the concrete abutment almost head-on. No known witnesses to the accident exist and Mr. Rosen testified no other vehicles were involved.
The only other testimony presented regarding the accident was that of Officer Craig Blair of the New Orleans Police Department. He was called to the |Rscene and wrote a police report about his investigation, which report was entered into evidence by stipulation. Officer Blair, who did not have an independent recollection of the accident, testified from his report. He stated that he interviewed Mr. Rosen, still seated in his car, who said he swerved to avoid hitting a car that suddenly stopped in front of him and struck the concrete abutment instead. Officer Blair testified that Mr. Rosen appeared coherent as he gave his statement.
While on the stand, however, Mr. Rosen categorically denied giving such a statement to the police.
Several DOTD employees testified for each side. All agreed that a guardrail is installed at a bridge end to redirect a vehicle astray from the roadway and to protect its occupants from hitting an abutment and other blunt objects.
Steven Strength, District Traffic Engineer for District 02, which encompasses New Orleans, testified that DOTD has a policy of installing guardrails at newly constructed or reconstructed bridge ends. He explained that the bridge in question did not have a guardrail on the date of the accident because it was built in the 1950’s before the AASHTO standards were adopted by the State. In addition, the vertical curve on the approach to the bridge provided some protection.
Mr. Strength also testified that before completion of Plan Change 64, the placement of a guardrail at the location would not have made the accident site safer because a flat or near-flat approach is needed for a guardrail to function properly; thus, a guardrail at a vertical curve would not perform as designed. Finally, because DOTD had not received any complaints or reports of problems at that area, the guardrail was installed only as part of a reconstruction project and not | (¡before that time. Mr. Strength testified the bridge end was not unsafe for lack of a guardrail on the date of the accident.
Michael Stack, a DOTD Road Design Engineer, testified that his office designed the guardrail in question as part of Plan Change 64. He stated that the policy of DOTD is to install guardrails at unprotected bridge ends or overpasses as part of reconstruction projects. He knew of only *505 one instance in the past ten years when DOTD installed a guardrail without a reconstruction project.
Also testifying was Kent Doyle, who had recently retired after working for DOTD for thirty years. At retirement, he had been the District 02 Construction Engineer for ten years and was responsible for all construction projects in the area. He explained that since built in the 1950’s, there had been no new construction or reconstruction projects on the Pontchartrain Expressway until Plan Change 64, which performed modifications and new construction to the approach of the new bridge across the river. Due to drainage problems in the area, Plan Change 64 changed the roadway to slope from the median to the outside, preventing water from ponding in the median. A guardrail was also added to bring the roadway up to newer safety standards that did not exist when the road was originally built. Mr. Doyle testified that the only time DOTD adds a guardrail without new construction or reconstruction is when a history of accidents exists in a specific area and DOTD believes that a guardrail will prevent them. He could recall of only one such instance in the preceding three years.
Both the parties also presented expert witnesses. The plaintiff called Messrs. McPhate and Clary. Mr. McPhate, who was qualified in the field of vehicle dynamics, testified on direct that due to excess rain water on the road and the presence of hydrocarbon “bleeding” from the new asphalt overlay, Mr. Rosen lost |7control of his vehicle and hydroplaned into the concrete abutment. However, Mr. McPhate also admitted under cross examination that the plaintiff most likely jammed on his brakes, thereby locking up his wheels, which prevented him from regaining control of the vehicle; this, he said, would constitute driver error. Further, he conceded that he did not have sufficient information to determine whether hydroplaning actually took place.
Mr. Clary, who was qualified in the field of highway design, engineering, signage, safety, and maintenance, testified that an unguarded bridge end on a highway of this classification is unreasonably dangerous. He stated that a guardrail should have been installed at the accident site when the roadway was originally built in the 1950’s. He also claimed that DOTD could have installed a temporary guardrail or other warning to protect motorists while the project was in progress.
While Mr. Clary claimed that the AASHTO guidelines manual classifies the lack of a guardrail as “unreasonably dangerous,” during cross-examination, he was unable to produce evidence to corroborate his testimony. In addition, Mr. Clary testified that there had been numerous projects in the area of the accident during which a guardrail could have been installed at the subject bridge end. However, under cross-examination, Mr. Clary admitted that he had not reviewed any of the project documents and was unable to identify any such project after 1969, the first full year the AASHTO guidelines were implemented by the State.
DOTD’s expert witness, David Hall, was accepted by the trial court as an expert in the fields of traffic engineering, highway design, planning, construction, and maintenance, traffic control devices, and vehicle dynamics. First, Mr. Hall testified that new asphalt provides the best frictional resistance to a vehicle and would not have caused Mr. Rosen to lose control of his vehicle. He was unfamiliar |swith the concept of new asphalt having a slick surface substance on it, as testified to by Mr. McPhate. Next, he testified that DOTD was not required to have a guardrail in place on the date of the accident because, *506 when the Expressway was built in the 1950’s, DOTD was not legally required to follow the AASHTO guidelines then in effect. The State did not adopt AASHTO until 1968. Mr. Hall agreed that standard procedure requires that a guardrail be installed at the end of a construction project so it is set at the correct height as per AASHTO guidelines.
However, Mr. Hall stated that he has never seen the AASHTO manual use the words “unreasonably dangerous,” as claimed by Mr. Clary. He also disagreed with Mr. Clary’s opinion that a temporary guardrail should have been placed at the accident site. Mr. Hall explained that anything not permanently installed would not offer any protection to a vehicle striking it.
Mr. Hall further testified that even if the guardrail had been in place on the day of the accident, it would not have prevented the extensive injuries sustained by Mr. Rosen. He asserted that because Mr. Ro-sen hit at the point where the guardrail would attach to the bridge end, he would have hit the bridge abutment with the same impact. This is, he claimed, typically the stiffest part of the guardrail because it is against the concrete abutment; thus, no give to the guardrail at that point would exist.
Under cross-examination, Mr. Hall admitted that under guidelines at the time of the accident, an unprotected bridge end on a highway, such as the Pontchartrain Expressway, is unsafe. However, before 1968, an unguarded bridge end was considered safe by the State. In addition, by engineering standards in the 1950’s, the area was safe without a guardrail because a barrier curve rail was in place instead. He agreed that the State would have placed a guardrail at the site if | athere had been an overlay project before the date of the accident. However, because there was no new construction or reconstruction before Plan Change 64 and no complaints, nothing to trigger the installation of a guardrail at the location occurred.
In reviewing the trial court’s findings of fact, we are governed by the manifest error-clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989). The issue to be resolved is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992).
The claim against DOTD is based on strict liability. The accident happened in 1994. The plaintiff argues that we cannot apply La. R.S. 9:2800 to his cause of action because the accident occurred before November 1995.[1] We agree.
La. R.S. 9:2800 was one of six separate statutory measures enacted by the legislature in 1985 to relieve the State of some of the ordinary burdens of tort liability. Chamberlain v. State, through DOTD, 624 So.2d 874, 878 (La.1993). One of the statutes, La. R.S. 13:5106(B)(1), was declared unconstitutional by Supreme Court in Chamberlain. However, the constitutionality of the other five statutory measures, including La. R.S. 9:2800 was not before the court at that time.
In 1995, the legislature passed Acts 1995, No. 1328, which proposed a constitutional amendment to La. Const. Article XII, § 10(C) allowing the legislature to limit the liability of the State. Moreover, the legislature also passed Acts 1995, No. 828 in which La. R.S. 9:2800 was reenacted in the same form |1floriginally enacted in *507 1985. The newly reenacted statute was to become effective upon the adoption of the constitutional amendment and share its effective date. The proposed constitutional amendment was submitted to the people of the State in the general election on 21 October 1995. The people approved the measure and it became part of the constitution, effective 23 November 1995.
La. R.S. 9:2800 was at issue in Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14, wherein the Supreme Court held that La. R.S. 9:2800 was unconstitutional until Acts 1995, No. 1328 and 828 became effective on 23 November 1995. Further, the law could not be applied to pending cases asserting causes of action that arose before its effective date. Id. at p. 12, 737 So.2d at 23.
Since this accident was in 1994, the plaintiff is only required to prove the traditional elements of strict liability under La. C.C. art. 2317. Dupree v. City of New Orleans, 99-3651 (La.8/31/00), 765 So.2d 1002. Therefore, the plaintiff had to prove that: (1) the DOTD owned or had custody of the thing that caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; and (3) the defect was a cause-in-fact of the accident. Id.[2] Thus, the fact that no evidence of any prior accidents at the site was presented at trial has no relevance to our analysis.
DOTD has a legal duty to maintain the highways in a reasonably safe condition. Sinitiere v. Lavergne, 391 So.2d 821, 824 (La.1980). The duty “extends to the protection of those people who may be foreseeably placed in [^danger by an unreasonably dangerous condition.” Id. at 825. It extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Trahan v. State, Department of Transportation & Development, 536 So.2d 1269, 1273 (La.App. 3 Cir.1988), writ denied, 541 So.2d 854 (La.1989). DOTD cannot knowingly allow a condition to exist that is a hazard to a reasonably prudent driver. In such a case, DOTD must take reasonable measures to eliminate or reduce the risks associated with the dangerous condition or may post adequate signs to warn the public of the danger, risk, or hazard involved. Id. at 1273.
Whether the roadway at the scene of an accident is in an unreasonably dangerous condition depends upon the facts and circumstances of each case. Hunter v. Department of Transportation and Development, 620 So.2d 1149, 1151 (La.1993). DOTD cannot escape liability by simply showing that the highway met the existing standards when it was built. Aucoin v. State, Department of Transportation and Development, 97-1938, 97-1967, p. 6-8 (La.4/24/98), 712 So.2d 62, 66-67. Design standards both at the time of original construction and at the time of the accident may be relevant factors in determining whether a given stretch of roadway presents an unreasonable risk of harm, but *508 are not determinative of the issue. Dill v. State, Department of Transportation and Development, 545 So.2d 994, 996 (La.1989). Although DOTD does not have a duty to bring old highways up to modern AASH-TO standards absent a major reconstruction of that highway, as explained by the Supreme Court in Cormier v. Comeaux, 98-2378, p. 9 (La.7/7/99), 748 So.2d 1123, 1129, whether DOTD has conformed to those | ^standards is a relevant factor in determining the ultimate issue of whether the roadway is unreasonably dangerous. Aucoin, 97-1938, 97-1967 at p. 7, 712 So.2d at 66.
DOTD’s first assignment of error is that the trial court should have assessed the plaintiff with some percentage of fault for either losing control of his vehicle and/or failing to regain control after skidding on the wet roadway. This is a finding of fact by the trial court, which is not clearly wrong or manifestly erroneous. Thus, this assignment is without merit.[3]
The next assignments of error concern the plaintiffs expert witnesses, Messrs. Clary and McPhate. With regard to Mr. Clary, DOTD argues that his opinions were generally reckless and unsupported by any evidence in the record. It further complains that many of Mr. Clary’s opinions were legal rather than professional in nature and that their witness, Mr. Hall, contradicted many of his statements. Finally, DOTD argues that Mr. Clary’s testimony was not credible and should be disregarded in its entirety.
First, we note DOTD did not object to a substantial majority of Mr. Clary’s testimony; therefore, it cannot now complain that Mr. Clary declared the accident site “unreasonably dangerous.” In addition, La. C.E. art. 704 provides in pertinent part:
Testimony [by an expert] in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.
| ^Therefore, Mr. Clary could opine that the unguarded bridge was unreasonably dangerous despite the fact that it was the ultimate issue to be decided by the trial court.
As to Mr. McPhate, DOTD first argues that he was permitted to testify to elements of accident reconstruction, which was outside his expertise of “vehicle dynamics.” We note that the defendant objected only once during Mr. McPhate’s testimony, and the trial court overruled that objection because the testimony related to the witness’s expertise in mechanical engineering. We find no error in the trial court’s ruling.
Second, DOTD argues that Mr. McPhate’s testimony did not meet the test of Daubert v. Merrell-Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993). In reviewing the record, however, we find that the trial court listened to an extensive voir dire of the witness before permitting him to testify. In fact, while the plaintiff sought to qualify Mr. McPhate in the fields of both accident reconstruction and vehicle dynamics, the trial court ultimately permitted testimony only in the latter field. We find that the trial court properly exercised its role as a “gatekeeper” and that Mr. McPhate’s testimony was properly admitted into evidence.
*509 With respect to both of the plaintiffs experts, DOTD contends that much of their testimony was contradicted by their own expert Mr. Hall. The law is well-settled that where the testimony of expert witnesses differs, the trier of fact has great, even vast, discretion in determining the credibility of the evidence, and a finding of fact in this regard will not be overturned unless clearly wrong. DeSambourg v. Board of Com’rs for Grand Prairie Levee Dist., 608 So.2d 1100, 110814 (La.App. 4 Cir.1992), affirmed, 621 So.2d 602 (La.1993). Further, the assessment of credibility of competing expert witnesses is best left to the trier of fact, who has the opportunity to observe the respective demeanor of the witnesses. Cash v. Charter Marketing Co., 607 So.2d 1036, 1039 (La.App. 3 Cir.1992). Therefore, while we may disagree with the conclusions of the trial court, we find that the trial judge’s reliance on the testimony of the plaintiffs experts over that of the defendant’s is not manifestly erroneous or clearly wrong. Consequently, these assignments of error are without merit.
We next address DOTD’s contention that the trial court should have granted its involuntary dismissal of the plaintiffs case pursuant to La. C.C.P. art. 1672B. Specifically, DOTD argues that the plaintiff did not establish by a preponderance of the evidence that any fault of DOTD, caused or contributed to the accident and injury.
La. C.C.P. art. 1672 B provides as follows:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all evidence.
Such a motion should be granted only “when the plaintiff has failed to establish his case by a ‘preponderance of the evidence.’ ” Haworth v. L’Hoste, 95-0714 (La.App. 4 Cir. 11/30/95), 664 So.2d 1335, 1339. A plaintiffs burden of proof in a civil case is by a preponderance of the evidence: all evidence, direct and circumstantial, taken as a whole must show that the causation or fact sought to be | -^proved is more probable than not. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (La.1971).
We apply the manifest error standard in our review of the trial court’s conclusions. Winston v. Flamingo Casino, 99-0209 (La.App. 4 Cir. 9/22/99), 746 So.2d 622. Obviously, the trial court placed great reliance on the testimony of the plaintiffs experts. Consequently, we find that the trial court was not manifestly erroneous in denying the motion for involuntary dismissal.
The next assignment of error concerns the trial court’s finding that DOTD breached its duty to provide a safe roadway by failing to place a guardrail at the bridge end. Contained therein is the defendant’s argument that the presence of a guardrail would have made no difference in the injuries sustained by the plaintiff. We address both issues simultaneously.
The discretionary function doctrine as codified in La. R.S. 9:2798.1[4] is relevant to *510 our consideration. As explained by the Supreme Court in Hardy v. Bowie, 98-2821 (La.9/8/99), 744 So.2d 606:
“Under [the discretionary function] doctrine, governmental decisionmakers exercising discretionary functions are immune from suit, because the courts should not chill legislative discretion in policy formation by imposing tort liability for discretionary decision.” Ferdinand F. Stone and Andrew Rinker, Jr., Governmental Liability for Negligent Inspections, 57 Tul. L.Rev. 328, 346 (1982).
However, where liability is based on a public entity’s non-discretionary acts, liability will be judged under the traditional duty-risk analysis. Fowler v. Roberts, supra [556 So.2d 1 (La.1989)](holding on rehearing that La. R.S. 9:2798.1 did not apply to immunize the DPS for its negligence, and reinstating the original majority opinion, as supplemented by the plurality opinion). In Fowler, we applied the two-step test enunciated in Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) for determining whether the discretionary function exception applies in specific fact situations. A court must first consider whether the government employee had an element of choice. “[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive.” Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1958. If the employee had no discretion or choice as to appropriate conduct, there is no immunity. When discretion is involved, the court must then determine whether that discretion is the kind which is shielded by the exception, that is one grounded in social, economic or political policy. If the action is not based on public policy, the government is liable for any negligence, because the exception insulates the government from liability only if the challenged action involves the permissible exercise of a policy judgment. Fowler v. Roberts, supra at 15.
Id. at pp. 10-11, 744 So.2d at 613.
As we apply the discretionary function test to the case before us, we find that before the Expressway’s reconstruction, DOTD had the discretion of whether to install a guardrail at the bridge end. However, once Plan Change 64 was complete and the roadway was opened for traffic, installation of the guardrail became non-discretionary under the AASHTO standards and La. R.S. 48:35. Thus, DOTD’s liability is appropriately determined under the traditional duty-risk analysis.
The determination of liability under the duty/risk analysis usually requires proof of five separate elements: (1) proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (2) proof that the defendant’s conduct failed to conform to the appropriate standard (the | ^breach element); (3) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (4) proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages ele *511 ment). Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606.
In the instant case, the trial court applied a duty-risk analysis and specifically found that the unguarded bridge end and not “driver error,” as alleged by DOTD, was the legal cause of the accident and the damages sustained by the plaintiff. The trial court also found that DOTD breached its duty to maintain the Expressway and its shoulders in a reasonably safe condition. The trial court found that DOTD had knowledge that the bridge end was unsafe since 1968, the year the State adopted the AASHTO standards. While the court considered DOTD’s internal policy of not upgrading a roadway to current safety standards until it performs new construction or reconstruction, it found that the risk of harm that someone like the plaintiff would collide with the unprotected abutment was within the scope of protection afforded by DOTD’s duty. We find no manifest error in these factual findings.
In addition, the trial court did not commit an error of law. As established in Cormier, 98-2378 at p. 12, 748 So.2d at 1131, the State has no duty to bring an old highway up to current safety standards unless the highway undergoes a major reconstruction. Nevertheless, the State has a duty to correct a condition existing on an old highway that is unreasonably dangerous. Id. Here, the trial court found that the condition existing on the Pontchartrain Expressway was unreasonably dangerous, based on the uncontroverted testimony of Mr. Clary, and, therefore, the guardrail should have been installed immediately upon completion of the preconstruction, if not before. This conclusion is not manifestly erroneous, clearly wrong, or wrong as a matter of law. We take judicial notice that the Pontchartrain Expressway is a major highway in an urban area and is used by a large volume of vehicular traffic daily. See La. C.E. art. 201.
Finally, it is clear that the trial court disregarded the testimony of DOTD’s expert, Mr. Hall, that the presence of the guardrail would not have lessened the plaintiffs injuries. The trial court is free to give as much weight as it deems appropriate to the opinions of experts. Therefore, this assignment is without merit.
Based on the above, we affirm the judgment of the trial court. The defendant is assessed with all costs of the appeal.
AFFIRMED.

. La. R.S. 9:2800 added an element of "actual or constructive notice” to the "strict liability” cause of action.

. We recognize that La. R.S. 9:2800 cannot be applied retroactively to cases asserting causes of action arising before 23 November 1995. See Jacobs, supra. However, the Supreme Court, in Cormier v. Comeaux, 98-2378 (La.7/7/99), 748 So.2d 1123, which involved a 1991 accident, stated that in order for DOTD to be held liable, a plaintiff must prove that, inter alia, "the DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable period of time.” Id. at p. 6, 748 So.2d at 1127. Such a statement of the law would in fact apply La. R.S. 9:2800 retroactively and is contrary to the Court's pronouncement in Jacobs, rendered only two months earlier. We resolve this irreconcilable conflict by holding Jacobs to be the controlling jurisprudence because it specifically dealt with the retroactive application of La. R.S. 9:2800.

. We also note that the trial court gave little weight to the police officer’s testimony because the officer had no independent recollection of the accident or his investigation. We find no manifest error in this decision.

. La. R.S. 9:2798.1 provides in pertinent part:
[[Image here]]
B. Liability shall not be imposed on public entities or their officers or employees based *510 upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.