| | | |
|---|---|---|
| **TKTMJ, INC.** | * | **NO. 2020-CA-0154** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **THE SEWERAGE AND** | * | |
| **WATER BOARD OF NEW** | | **FOURTH CIRCUIT** |
| **ORLEANS** | * | |
| | | **STATE OF LOUISIANA** |

**\* \* \* \* \* \* \***

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-11900, DIVISION "I-14"
Honorable Piper D. Griffin, Judge
\* \* \* \* \* \*
**Judge Paula A. Brown**
\* \* \* \* \* \*

(Court composed of Judge Sandra Cabrina Jenkins, Judge Regina Bartholomew-Woods, Judge Paula A. Brown)

**JENKINS, J., CONCURS IN THE RESULT**

Daniel Lund, III
Stuart Glen Richeson
Carys A. Arvidson
PHELPS DUNBAR, LLP
365 Canal Street, Suite 2000
New Orleans, LA 70130

      COUNSEL FOR PLAINTIFF/APPELLEE

John M. Landis
Nicholas J. Wehlen
STONE PIGMAN WALTHER WITTMANN L.L.C.
909 Poydras Street, Suite 3150
New Orleans, LA 70112

      COUNSEL FOR DEFENDANT/APPELLANT

      **REVERSED IN PART, AFFIRMED IN PART, AMENDED IN PART, AFFIRMED AS AMENDED, RENDERED**
      **December 16, 2020**

This is a contractual dispute. Appellant, the Sewerage and Water Board of New Orleans ("S&WB"), entered into two contracts with Appellees, TKTMJ, Inc. ("TKTMJ"), a general contractor, to replace two sewerage pumping stations. TKTMJ filed a petition against S&WB, alleging breach of contract. In turn, S&WB filed a reconventional demand against TKTMJ and a third-party demand against TKTMJ's surety, Travelers Casualty and Surety Company of America ("Travelers"), asserting breach of contract by TKTMJ. After a bench trial, the district court rendered judgment in favor of TKTMJ and Travelers, awarding TKTMJ $1,719,808.24 in total damages and dismissing S&WB's reconventional and third-party demands. S&WB appeals the district court's judgment.

For the reasons set forth below, we reverse the district court's judgment, in part, amend in part and affirm as amended.

## FACTS/PROCEDURAL HISTORY

On October 14, 2013, S&WB and TKTMJ entered into a contract, the Plum Orchard Contract,[1] whereby TKTMJ was to construct a replacement sewage pumping station. The initial value on this contract was $1,126,180.00. The parties

---

[1] The project was known as "Contract No. 3667 - Hurricane Katrina Related 404 Hazard Mitigation Grant Program. Replacement of "Plum Orchard Sewage Lift Station."

1

entered into a second contract on that same date, the Dodt Contract,[2] whereby TKTMJ was to construct a replacement sewage pumping station. The initial value on this contract was $1,379,991.00. S&WB provided TKTMJ with the plans and specifications for the construction of the stations. The specifications provided that each station consist of: (a) a wet well that filled with sewage; (b) suction lines that originated in the wet well and facilitated the pumping of sewage to a dry well; and (c) pumps, located in the dry well, that pumped sewage away from the station to another location. The electrical and mechanical equipment were located inside of the dry well. During the construction, TKTMJ operated and maintained bypass pumps for both stations.

TKTMJ agreed that the stations would be completed within 365 calendar days. The contracts provided that issuance of the work order by S&WB to TKTMJ established the start of the 365-day period. The issuance of the Plum Orchard Station work order was January 6, 2014; thus, the Plum Orchard Station's completion date, without delays, was January 6, 2015. A building permit was not issued on the Dodt Station until February 19, 2014, and S&WB concedes that the completion of the contract date for the Dodt Station, without further delays, was February 19, 2015. The contract provided that TKTMJ would be assessed liquidated damages, at $500.00 a day, if the projects were not completed within the 365-day period.

During construction of the stations, several problems arose, and S&WB requested TKTMJ perform additional work or extra work on both stations, which

---

[2] The project was known as "Contract No. 3665 - Hurricane Katrina Related 404 Hazard Mitigation Grant Program, Replacement of "Dodt Street Sewage Pumping Station."

resulted in additional costs and delays to the completion date. TKTMJ sought reimbursement from S&WB; however, S&WB denied reimbursement.

On December 5, 2016, TKTMJ filed a petition alleging S&WB was in breach of both contracts. TKTMJ prayed for damages for "its outstanding contract balances, amounts for . . . additional work performed,[3] damages caused by S[&]WB's breach of contract, damages as a result of delays caused by S[&]WB and an extension of the time required to perform the contract." TKTMJ asserted that the outstanding contract balance due on the two projects was $144,615.19.

A bench trial was held over several days in March 2018, and the district court took the matter under advisement. On August 9, 2018, the district court rendered judgment in favor of TKTMJ, awarding TKTMJ total damages in the amount of $1,719,808.24 plus judicial interest, and issued written reasons for judgment.[4] The district court dismissed S&WB's reconventional demand against

---

[3] TKTMJ's alleged additional work on the Plum Orchard Station included pressure injection of cracks in the dry well walls; installation of a release line to the wet well; installation of corrective measures to fix a bubble panel/SCADA panel, emergency lighting, exhaust fan thermostat and disconnect switch for exhaust fan; installation of a drip cup for the backflow preventer; installation of suction line expansion joints; changes to the fence height and length; installation of gate stops and station door stops; provision of additional waterproofing additives; replacement of a new blower motor; and extended overhead electric heater. As to the Dodt Station, TKTMJ's alleged additional work included pressure injection of cracks in the dry well walls; installation of a release line to the wet well; installation of corrective measures to fix a bubble panel/SCADA panel, emergency lighting, exhaust fan thermostat and disconnect switch for exhaust fan; installation of a drip cup for the backflow preventer; installation of suction line expansion joints; changes to the fence height and length; installation of gate stops and station door stops; provision of additional waterproofing additives; replacement of a new blower motor; and extended overhead electric.

[4] It is a "'well-settled rule that the district court's oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment.'" *Wooley v. Lucksinger,* 09-0571, 09-0584, 09-0585, 09-0586, p. 77 (La. 4/1/11), 61 So.3d 507, 572 (quoting *Bellard v. American Cent. Ins. Co.*, 07-1335, p. 25 (La. 4/18/08), 980 So.2d 654, 671). However, a court of appeal may review the trial court's reasons for judgment to "gain insight" into the trial court's judgment. *Id.*, 09-0571, 09-0584, 09-0585, 09-0586, p. 78, 61 So.3d at 572; *See also Double NRJ Trucking, Inc. v. Johnson*, 17-667, p. 7 (La. App. 5 Cir. 5/16/18), 247 So.3d 1125, 1131. *Bruno v. CDC Auto Transp., Inc.,* 19-1065 (La. App. 4 Cir. 6/3/20), 302 So.3d 8, 13, *writ denied,* 20-00836 (La. 10/14/20), 302 So.3d 1118.

3

TKTMJ and third-party demand against Travelers. This timely suspensive appeal followed.[5]

## DISCUSSION

S&WB raises multiple assigned errors which essential fall under two categories: (1) the district court erred in awarding certain damages to TKTMJ;[6] and (2) the district court erred in failing to award S&WB liquidated damages.

*APPLICABLE LAW*

Before discussing the assigned errors, we examine the applicable standards of review and burden of proof.

---

[5] Due to incomplete trial transcripts, this Court ordered that the case be remanded to the district court for correction and completion of the record. *TKTMJ v. S&WB*, 18-995 (La. App. 4 Cir. 4/24/29). On March 2, 2019, this appeal was lodged.

[6] S&WB asserts the district court erred in awarding the following damages to TKTMJ:

  a. $423,162.30 in damages for delays related to defects in the concrete walls of the Plum Orchard Station;
  b. $17,209.95 in damages for delays related to the correction of piping in the Plum Orchard Station wet well;
  c. $22,271.70 in damages for delays associated with power line work by Entergy, a non-party to this case;
  d. $16,197.60 in damages for delays associated with expansion joint work at Plum Orchard Station;
  e. $10,123.50 in damages for delays associated with the redesign of a Temporary Restraining Structure ("TRS") at the Dodt Station; and
  f. $136,667.25 in damages for delays associated with defects in the concrete walls of the Dodt Station;
  g. delays as a result of adverse weather; and
  h. all additional costs or extra work claimed by TKTMJ.

In its assigned errors, we note that S&WB relies solely on the testimony of Jeffrey Wentz, TKTMJ's expert, in ascertaining the damage award for each item. Mr. Wentz determined the amount of the award by multiplying the compensable delay days by the daily burn rate, which will be discussed *infra*. S&WB uses the daily burn rate of $1,012.35, which Mr. Wentz mistakenly testified to at trial. Review of the exhibits attached to Mr. Wentz's expert report, which were offered, filed, introduced and admitted into evidence, reveals: (1) the burn rate for the Plum Orchard Station was $1,015.34613 (rounded up to $1,015.35); and (2) there were three daily burn rates for the Dodt Station: for the period of January 7, 2015 to August 9, 2015, the burn rate was $954.64; for the period of August 10, 2015 to November 18, 2016, the burn rate was $1,249.18; and for the period of November 19, 2016 to August 2, 2016, the burn rate was $930.09.

4

*Standard of Review*

"The interpretation of the language of a contract is a question of law subject to *de novo* review, while factual determinations are subject to the manifest error standard of review." *Bodenheimer v. Carrollton Pest Control & Termite Co.*, 17-0595, 2018 WL 851808, at *4 (La. App. 4 Cir. 2/14/18)(citation omitted). This Court, in *Eckstein v. Becnel*, 17-0868, 17-0869, 17-0870, p. 9 (La. App. 4 Cir. 6/27/18), 250 So.3d 1046, 1053, *writ denied*, 18-1275 (La. 11/5/18), 255 So.3d 1054 (citation omitted), explained that "[i]n applying the manifest error review standard to the district court's interpretation of the contract, the appellate court may not substitute its own view of the evidence for the district court's view or disturb the district court's fact findings so long as its findings are reasonable."

The standard of review of an award of damages was set forth in *Bryan v. City of New Orleans*, 98-1263, pp. 2-3 (La. 1/20/99), 737 So.2d 696, 697-98:

> The fact finder has great discretion in determining the amount of damages, and appellate courts should rarely disturb such an award. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260-61 (La. 1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is well settled that a lump sum judgment is presumed to award all items of damages claimed. *Reichert v. Bertucci*, 96-1213 (La. App. 4th Cir.12/4/96), 684 So.2d 1041, *writ denied*, 97-0023 (La. 2/7/97), 688 So.2d 511; *Boutte v. Nissan Motor Corp.*, 94-1470 (La. App. 3[r]d Cir. 9/13/95), 663 So.2d 154. The appellant's burden of proving the fact finder clearly abused its great discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable.

When differing expert opinions are presented in support of a demand for damages, as in this case, the trier of fact is granted broad discretion:

> The law is well settled that where the testimony of expert witnesses differs, the trier of fact has great, even vast, discretion in determining the credibility of the evidence, and a finding of fact in this regard will not be overturned unless clearly wrong. *Rosen v. State,* 2001-0499 (La. App. 4 Cir. 1/30/02), 809 So.2d 498, 505 [,] citing *DeSambourg v. Board of Comm'rs for Grand Prairie Levee Dist.,* 608

So.2d 1100, 1108 (La. App. 4th Cir.1992). Further, the assessment of credibility of competing expert witnesses is best left to the trier of fact, who has the opportunity to observe the respective demeanor of the witnesses. *Id.,* citing *Cash v. Charter Marketing Co.,* 607 So.2d 1036, 1039 (La. App. 3rd Cir. 1992).

*Doe v. Archdiocese of New Orleans*, 01-0739, 01-1748, p. 8 (La. App. 4 Cir. 5/8/02), 823 So.2d 360, 365.

*Burden of Proof*

The burden of proof in this case fell on TKTMJ. In *Sullivan v. City of Baton Rouge*, 14-0964, p. 21 (La. App. 1 Cir. 1/27/15), 170 So.3d 186, 201, the First Circuit explained that the burden to prove delay damages falls on the party asserting the claim. In *James Const. Grp., L.L.C. v. State ex rel. Dep't of Transp. & Dev.*, 07-0225, p. 13 (La. App. 1 Cir. 11/2/07), 977 So.2d 989, 998 (citations omitted), the First Circuit held that when stipulated damages are set forth in a contract, the obligor, TKTMJ in this case, bears the burden of defeating that presumption because the obligee, S&WB in this case, has suffered loss due to the failure of the obligor to perform.

With these precepts in mind, we review S&WB's assigned errors.

## TRIAL COURT ERRED IN AWARDING ADDITIONAL COSTS AND DELAY DAMAGES

S&WB complains the district court erred in awarding additional costs, delay days, and delay damages on two grounds: (1) TKTMJ failed to comply with the written notice requirement under the contracts to trigger delay damages; and (2) TKTMJ was at fault for the costs and delays.

### Delay damages defined

Delay damages are defined in La. Prac. Constr. Law § 9:10 as when "one party to the contract has delayed without justification, the performance of the other

6

party, and thereby caused damages to that party, the breaching party will be held responsible for all such damages that flow from the delay." "If liquidated damages are set forth in the contract, then the non-breaching party will be entitled to those damages for delay and nothing more." *Id.* However, "[i]f there is no such clause, the non-breaching party is entitled to recover all damages that reasonably flow from the delay," which includes the following types of expenses:

- Field expenses, such as extended job costs for men and superintendents;
- Idle equipment;
- Increased costs of labor;
- Increased material costs; and
- Loss of efficiency if the contractor cannot complete the project according to his original schedule.

*Id.* In addition, even when not referenced in the contracts, La. R.S. 38:2216(H) provides recovery of delay damages for a contractor who entered a public contract with a public entity, as in this case:

> Any provision contained in a public contract which purports to waive, release, or extinguish the rights of a contractor to recover cost of damages, or obtain equitable adjustment, for delays in performing such contract, if such delay is caused in whole, or in part, by acts or omissions within the control of the contracting public entity or persons acting on behalf thereof, is against public policy and is void or unenforceable. When a contract contains a provision which is void and unenforceable under this Subsection, that provision shall be severed from the other provisions of the contract and the fact that the provision is void and unenforceable shall not affect the other provisions of the contract.

*See also*, *F.H. Myers Const. Corp. v. State, Div. of Admin. Office of Facility Planning & Control*, 13-2153, 2014 WL 3702302 at *5 (La. App. 1 Cir. 6/18/14), (wherein the appellate court explained that delay damages may include when the public entity was only partially at fault for the delay).

In the case *sub judice*, the contracts did not include a delay or liquidated damages provision in favor of TKTMJ, if S&WB or persons acting on behalf of the

7

S&WB caused a delay in completion of the contract date. As a result, delay damages were allowed pursuant to La. R.S. 38:2216(H), and both parties retained experts to testify as to the basis used to determine the delays that impacted the completion date and delay damages. Jeffrey Wentz,[7] hired by TKTMJ and accepted by the district court as an expert in the area of evaluation of construction delays, explained that there were compensable delay days and non-compensable delay days, which extended the completion date of the contract if the activity that caused the delay impacted the critical path of the work. William Manginelli, hired by S&WB and accepted by the district court as an expert in construction, scheduling and delay analysis, agreed that "if an activity is on the critical path and it's delayed [,] it will delay the end [completion] date."

Mr. Wentz testified that to determine delay damages, the number of compensable delay days are multiplied by the daily burn rate, based on "the sum of cost incurred by the contractor in performing the work." Mr. Wentz stated he considered "every day . . . from the moment [TKTMJ] mobilized and started their bypass pumping to the point that the bypass pumps were removed." Mr. Wentz explained, pertinent to this case, he considered "[e]quipment and employees to maintain those pumps as well . . . diesel . . . the cost of electricity . . . general field costs such as the port-o-pots and other elements." Mr. Wentz continued that because TKTMJ incurred costs to operate the bypass pumps, "the delay claims really [are] a calculation of the number of days and costs to operate those bypass pumps for everyday they are beyond their base contract."

---

[7]At trial, Mr. Wentz testified he did a "[f]ull re-evaluation." He stated that he looked at the change proposal requests, including any documentation attached, that TKTMJ prepared and submitted to S&WB as well as other documentation and items he needed to review. He estimated he looked at over 150,000 documents.

For the Plum Orchard Contract, Mr. Wentz calculated that TKTMJ experienced 473 compensable delay days. He testified that TKTMJ was entitled to delay damages in the amount of $480,258.72[8] and an extension of the completion date of the contract of 495 days. As to the Dodt Contract, Mr. Wentz concluded that TKTMJ was entitled to 574 compensable delay days. He testified that TKTMJ was entitled to delay damages in the amount of $545,688.23[9] and an extension of the completion date of the contract of 574 days.

As to additional costs, Mr. Wentz testified that TKTMJ was entitled to direct costs for changes ordered by S&WB to the Plum Orchard contract in the amount of $239,433.03, and to the Dodt contract in the amount of $309,813.07.

The total award Mr. Wentz claimed owed to TKTMJ for delay damages and additional costs was $1,575,193.05.

As noted *supra*, the district court awarded TKTMJ $1,719,808.24 in total damages. A review of the record reveals the district court, in determining the total damages award, relied on Mr. Wentz's testimony, awarding TKTMJ $1,575,193.05 in costs and delay damages, plus the contract balance owed, $144,615.19. Thus, the amount of a specific award is ascertainable.[10]

*Notice requirement defined and interpreted*

S&WB asserts TKTMJ is not entitled to delay damages because the contract required TKTMJ to notify S&WB in writing, within seven days, of any alleged delays that influenced the completion of TKTMJ's work to trigger the delay

---

[8] See footnote 6.

[9] See footnote 6.

[10] See footnote 6.

damages.  S&WB correctly points out the district court did not directly address the notice requirement.

TKTMJ counters that the district court's reasons support a finding that the notice requirement under the contract was met or waived by S&WB.

S&WB's assertion requires interpretation of the contract; thus, a *de novo* review is proper.  See *Bodenheimer,* 17-0595 at *4.

In *Brady v. Pirner*, 18-0556, p. 13 (La. App. 4 Cir. 12/5/18), 261 So.3d 867, 876 (quoting *Lalla v. Calamar, N.V.,* 08-0952, p. 8 (La. App. 4 Cir. 2/11/09), 5 So.3d 927, 932), this Court set forth the principles of law for interpreting a contract:

> Meaning and intent of parties to a written instrument is ordinarily determined from the instrument's four corners and extrinsic evidence is inadmissible either to explain or to contradict the instrument's terms. *Abshire* [*v. Vermilion Parish School Bd.*], 02-2881, p. 5 [(La. 6/27/03)], 848 So.2d [552] at 555, *citing Ortego v. State, Dept. of Transp. and Dev.*, 96-1322 (La. 2/25/97), 689 So.2d 1358. "The contract is the law between the parties, and no further interpretation may be made in search of the parties' intent when the words of the contract are clear, explicit and lead to no absurd consequences." *Taylor v. Manuel*, 01-0653, p. 3 (La. App. 3 Cir. 10/31/01), 799 So.2d 812, 815; *citing Woolf & Magee v. Hughes*, 95-863, p. 5 (La. App. 3 Cir. 12/6/95), 666 So.2d 1128, 1131, *writ denied*, 96-0073 (La. 3/15/96), 669 So.2d 427.

The Supreme Court in *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 12-2055, p. 6 (La. 3/19/13), 112 So.3d 187, 192 (citations omitted), noted that a contract must be interpreted in a common-sense fashion.  It continued that a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and each provision must be interpreted in light of the other provisions "so that each is given the meaning

10

suggested by the contract as a whole." *Id*. (footnote omitted). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. C.C art. 2053. "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." La. C.C. art. 2056.

With these principles in mind, we turn to the contracts.

The contracts, which were identical, provided several provisions in the event TKTMJ encountered delays.

First, the contracts provided that "[t]he Engineer[11] may order the Contractor in writing to suspend, delay or interrupt all or any part of the work for such period of time as he may determine to be appropriate. . . ."(Special Specifications 2-41(A)). "No adjustment to the time of completion for the project would be made if the suspension, delay or interruption to the work was ordered due to the fault or negligence of the Contractor; however, if such suspension, delay or interruption if ordered for reasons other than the Contractor's negligence, the period of such suspension, to be determined by the Engineer, shall be added to the time specified for the completion of the work under this contract." (Special Specifications 2-41(B)).

---

[11] The Engineer of record was Design Engineer Inc. ("DEI"), the company that designed both pumping stations, and Burk-Kleinpeter, Inc. ("BKI"), the engineering firm S&WB hired to serve as the project representative for both stations.

Second, the contracts provided that if "Extra Work" becomes necessary that was not provided for in the contract, "the Engineer will issue an order, and the Contractor shall perform the work stated in the order." Several ways were set forth in the contract to pay the Contractor for "Extra Work." (General Provisions (31)).

Third, "[w]hen change orders or delays are experienced by Contractor and Contractor requests a[n] extension of time, Contractor shall submit a written time impact analysis to the Engineer illustrating the influence of each change or delay to the current Contract Schedule competition date. . . ." (Special Specifications 2-30(E)). No timetable for this requirement was set forth in the contracts. It continues, "Delays in activities which are not on the critical path and do not affect Contract completion dates, will not be considered for an extension of time." (Special Specifications 2-30(E)(2)).

Fourth, the contracts provided for S&WB to deduct or recover liquidated damages from TKTMJ or its surety. The contracts set liquidated damages at $500 per day, for each day beyond the completion date of the contracts. (Special Specifications 2-09). The start date of the contracts was the date the Engineer[12] issued the work order, and the completion date was 365 days after the start date. If TKTMJ failed to complete the contracts timely, S&WB could retain liquidated damages or if money was due to TKTMJ by S&WB and it was insufficient to cover the liquidated damages, "the deficiency shall be supplied by [TKTMJ's] Surety." (General provisions (26)). In addition, the contracts provided that the "Contractor" was not to be charged liquidated damages if the delay was due to unforeseeable causes beyond the control of "Contractor," without "fault or negligence on [its] part, such as unforeseeable causes including (but not restricted

_____
[12] See footnote 11.

to) inability to obtain supplies and materials, Acts of God . . . fires, floods . . . strikes, freight embargos or delays of subcontractors caused by such conditions." (emphasis added)(General Provisions (26)). "The relief of the Contractor from the charge of liquidated damages . . . is contingent, however, on [its] notifying [S&WB] in writing, of the causes of the delay within seven (7) consecutive calendar days after the beginning of such delay. . . ." (General Provisions (26)). The contracts provided that these provisions, Special Specifications 2-09 and General Provisions (26), were to be strictly "interpreted and rigidly enforced." (Special Specification (2-09(C)).

After reviewing the four corners of the contracts and applying the applicable law discussed *supra*, we conclude that in the event TKTMJ submitted a change order, or encountered a delay, or needed an extension of time as a result of an action or direction by TKTMJ, or someone other than S&WB, TKTMJ was required to give S&WB written notification in the form of a time-impact analysis to be entitled to add days to the completion of the contract, and to give written notification of the delay, within seven days after the beginning of the delays, to avoid paying liquidated damages. We further conclude TKTMJ was not required to give a time-impact analysis or written notification to S&WB in the event S&WB suspended the work, and changed or added work.

Guided by these determinations, we turn to S&WB's specific assigned errors, which are divided by the Plum Orchard Station and the Dodt Station. Under each station, we will address the applicability of the contract notice requirement and whether TKTMJ was at fault for the extra costs and delays.

13

### *Plum Orchard Station*

Mr. Wentz opined that TKTMJ was entitled to direct costs for changes ordered by S&WB to the Plum Orchard Contract in the amount of $239,433.03. Mr. Wentz calculated that TKTMJ experienced 473 compensable delay days for a total of $480,258.72[13] in delay damages, and an extension of the completion date of 495 days. Mr. Wentz calculated the specific delays encountered during the project which S&WB contests:

|                            |                  |
|----------------------------|------------------|
| Injection in dry well wall | 418 calendar days |
| Flange-to-Flange Replacement | 17 calendar days |
| Overhead Service Extension | 22 calendar days |
| Added Expansion Joint | 16 calendar days |

### *Dry well wall*

Construction on the Plum Orchard Station began on March 24, 2014. The completed standing building on the Plum Orchard site contained the dry well. As part of the contract, TKTMJ was responsible for building walls for the dry well. The plans and specifications for the Plum Orchard Station that S&WB gave to TKTMJ provided the following for the walls of the dry well structure: the walls were to be constructed with a minimum of two inch concrete cover over the steel rebar located within the walls; a mixture was recommended for the concrete for the dry well walls; and the concrete was to be poured from a certain height to be approved by the Engineer.[14] During the construction, S&WB complained that TKTMJ improperly constructed the dry well wall. In November 2014, S&WB issued correspondence to TKTMJ claiming that the "dry well" structure showed

---

[13] See footnote 6.

[14] See footnote 11.

signs of water intrusion and structural insufficiency and ordered TKTMJ to suspend all work on the Plum Orchard Station.

Jim Cipriani, an employee of BKI[15]—the engineering firm S&WB hired to be its project representative—served as construction manager for both of the stations, monitored job progress and made decisions on behalf of the S&WB. Mr. Cipriani testified that S&WB suspended work on the Plum Orchard Station on November 21, 2014, because S&WB was concerned about the structural integrity of the dry well walls.[16] Likewise, Chris Bergeron, department head of mechanical engineers for S&WB, who served as project manager for the Plum Orchard and Dodt Stations, testified as to why S&WB suspended work on the Plum Orchard Station:

> We had witnessed the water intrusion coming through the walls, and looking back at pictures we recalled that the exterior of the station was exposed and the . . . rebar was exposed after the forms were removed, so we felt that it was likely that water was coming through the walls exposing those rebar to moisture into the atmosphere at the time it was exposed and with water being in the walls we wanted to ensure that the life of the station was not going to be shortened by this construction. We had designed this to last a significant amount of time and if rebar was consistently exposed to water it could potentially corrode and compromise those walls.

Testimony and evidence at trial showed that TKTMJ, although TKTMJ denied waterproofing was part of the contract, communicated to S&WB, including submitting two change orders, suggestions on how to waterproof the dry well structure, On December 9, 2014, TKTMJ submitted a proposal to waterproof the dry well wall, and on December 16, 2014, S&WB generally accepted the

---

[15] See footnote 11.

[16] Mr. Cipriani was unavailable for trial. As a result, the district court took the matter under advisement, and the parties agreed to allow Mr. Cipriani's testimony post-hearing via joint stipulation.

proposal—injection of the dry well walls with crystalline resin or epoxy grout—pending additional details concerning the installation procedure. However, on March 25, 2015, S&WB directed TKTMJ to excavate the area around the "drywell" and remove all materials previously applied to both the interior and exterior of the walls and to add mortar prior to performing the injection work. TKTMJ complied. The injection remediation was performed in October 2015, and the work order suspension was removed in January 2016. During the suspended work period, TKTMJ provided and maintained bypass pumps to keep the station functioning.

Mr. Wentz opined that TKTMJ incurred $18,316.71 in direct costs investigating and addressing the water intrusion issue and 418 compensable delay days. He opined that under a stop work order, such as the one issued by S&WB for Plum Orchard station, "[y]ou can't do any work so therefore everything is on a critical path and it's a day for day delay."

S&WB asserts that the district court erred in awarding TKTMJ delay damages[17] because TKTMJ failed to comply with the written notice requirement. Alternatively, S&WB asserts the delay was the fault of TKTMJ.

S&WB's assertion that TKTMJ was not entitled to delays it incurred as a result of the requested repairs to the dry well wall because TKTMJ failed to provide written notification, lacks merit. Mr. Cipriani wrote a letter to TKTMJ suspending work on the Plum Orchard Station starting November 21, 2014, and the suspension of work order was removed in January 2016. Since S&WB suspended work on the Plum Orchard Station, under the terms of the contract, TKTMJ was

---

[17] See footnote 6.

16

not required to give written notice to S&WB to seek costs or delays in the completion of the contract date.

Next, S&WB contends it is not responsible for the delay damages and/or additional costs incurred by TKTMJ because it presented evidence that the delay due to the dry well wall was the fault of TKTMJ.[18] S&WB complained that TKTMJ failed to get approval of the height of the concrete drop as required by the contract; TKTMJ poured the concrete from a height of more than ten feet; and the concrete mixture did not include waterproof materials as S&WB had directed. In addition, at trial, James Danner, an engineer for Denson Engineering, Inc., who was accepted by the district court as an expert in civil and structural engineering, testified that he was hired by S&WB to evaluate the concrete walls at the Plum Orchard Station. Premised on his analysis of pertinent documents and other relevant evidence, Mr. Danner concluded that "based on the amount of honeycombing noted, cracks, moisture intrusion and the testing that was done specifically ground penetrating radar scanning, it [was] reasonable that Sewerage & Water Board required the contractor to demonstrate structural integrity of the concrete in the walls."

To the contrary, testimony and evidence at trial showed that in April 2015, a concrete analysis on the dry well wall was done by American Engineering Testing,

---

[18] Mr. Cipriani testified that "[t]o the extent TKTMJ sought payment or added contract time due to the water intrusion and wet well connection issues . . . the change orders were rejected because any expense or delay resulting from those issues are the responsibility of the contractor." Mr. Cipriani admitted that "[n]either [he] nor the S[&]WB approved any of the Plum Orchard change orders that TKTMJ submitted in 2016."

In addition, Mr. Bergeron testified that the S&WB did not determine if TKTMJ was entitled to an extension of time associated with the water intrusion at the Plum Orchard Station, and he admitted no change orders were executed by S&WB giving TKTMJ a change in time for extending the completion date.

Inc. ("AET"), and it concluded the concrete originally poured was "good."[19]  In

addition, Mr. Cipriani testified that in May 2015, Construction Solutions, LLC,

opined that rebar corrosion was not detected and "the observed voids did not

impact the structural integrity of the walls."  He continued, noting that after the

walls were injected with epoxy grout, it was determined that the injection

successfully eliminated any "detectable leak paths through the walls."[20]

Based on the evidence that the dry well walls were structurally sound, the

district court found the delay was the fault of S&WB writing:

> [E]very single witness who testified on the topic of the
> suitability of the Plum Orchard dry well walls to remain in place
> confirmed that a finding was reached that the walls were indeed
> structurally sound - and always were - that the walls could be
> preserved and used, and that, in fact, the walls were allowed to remain
> in place by virtue of an injection method to address water intrusion.
>
> In view of the foregoing, and noting that the project designer,
> DEI [Design Engineer Inc], approved on December 16, 2014, an
> injection method within less than a month after the water intrusion
> was first noted (November 21, 2014), the more than one year of
> delays associated with the eventual injection of the Plum Orchard dry
> well walls are due to [S&WB's] own actions.

Applying the manifest error standard, we conclude it was not unreasonable,

based on the evidence presented, that the district court found that the delay was due

to the actions of S&WB. Thus, the district court did not err in awarding TKTMJ

additional costs, delay days, and delay damages for the dry well wall.

*Flange-to-Flange replacement*

In August 2014, TKTMJ installed a mechanical fastening connection to

connect piping in the wet well.  In January 2015, S&WB sent TKTMJ notice that

---

[19] American Engineer Testing, Inc.'s report was offered, filed, introduced, and admitted into evidence at trial.

[20] The report by Construction Solutions, LLC, was offered, filed, introduced, and admitted into evidence at trial.

the connection did not comply with the construction plan that called for a flange-to-flange connection. S&WB ordered TKTMJ to change the connection. Mr. Wentz concluded TKTMJ's additional costs for the flange-to-flange replacement was $30,793.96 and TKTMJ was entitled to 17 compensable delay days.

S&WB contends TKTMJ failed to give written notification of the impact of the delay, which precluded TKTMJ from being awarded delays. As noted above, S&WB ordered TKTMJ to change the flange-to-flange. Thus, we find there was no written notice requirement under the contract.

Alternatively, S&WB asserts that TKTMJ is at fault for any delay. S&WB argues: (1) the construction plans specifically called for a flange-to-flange connection; (2) if TKTMJ found plans ambiguous, the contract required TKTMJ to seek a clarification from S&WB;[21] and (3) the incorrect fastening connection was installed because TKTMJ measured the piping incorrectly. Mr. Bergeron, S&WB's project manager, testified that S&WB's construction plan for the Plum Orchard Station required a specific type of connection, "a 90 degree elbow to have a flair and flange." Mr. Bergeron was of the opinion that TKTMJ erred in installing the restrained mechanical joint in the wet well, and TKTMJ did not ask permission to do so.

---

[21] General Specification 12 (Information for Bidders, Interpretation of Specifications) of the contracts provided in part:

> If any person contemplating submitting a proposal for a contract is in doubt as to the true meaning of any part of plans, specifications or other proposed contract documents, he may submit to the Purchasing Agent of Contractor a written request for an interpretation thereof. Contractor will not be responsible for any other explanation or interpretation of the proposed documents. . . .

Conversely, Michael Tubre, vice-president of TKTMJ, who was involved in the projects from bidding through trial,[22] testified that TKTMJ interpreted the construction plans for the wet well at Plum Orchard Station to be ambiguous. He was of the opinion that placing a flange-to-flange connection contradicted the specifications. Danny Lumpkin, a TKTMJ employee who was the project manager for both stations beginning in February 2015, agreed and testified the specifications did not reflect a flange-to-flange connection. Although TKTMJ responded to S&WB requests to change the connection with a more cost-efficient alternative method, Mr. Tubre testified that S&WB rejected the more cost-efficient alternative and waited until after concrete was poured around the site to request the change to a flange-to-flange connection, resulting in more costs and delays.

S&WB also urged that no compensable delay days should have been awarded to TKTMJ because TKTMJ could have changed the connection while the work was suspended on the dry well wall, and the work was not part of the critical path. Mr. Wentz disagreed. Mr. Wentz explained that TKTMJ could not have changed the connection while the work was suspended on the dry well wall due to the stop work order issued by S&WB. Mr. Wentz explained the only way TKTMJ could work on the flange-to-flange replacement was if the stop work order was revised and modified. No evidence was presented to show the stop work order was revised to allow this work to proceed.

The district court concluded S&WB was at fault for the costs and delay as follows:

---

[22] Due to the incomplete transcription of Mr. Tubre's testimony, the parties agreed to file in the district court an affidavit by Mr. Tubre to supplement the trial court record with Mr. Tubre's March 5, 2018 direct examination trial testimony.

On January 12, 2015, in violation of the plans and specifications for the Plum Orchard Project, S&WB insisted that TKTMJ remove the piping with the mechanical joint connections and replace it with a flange-to-flange connection. Doing this additional mandated work required TKTMJ to demolish and reconstruct certain substantial work previously performed on the Plum Orchard Project, at substantial and unnecessary cost.

Further, although TKTMJ disagreed (and continues to disagree) that the plans and specifications for the Plum Orchard Project called for a flange-to-flange connection at the referenced location, TKTMJ proposed to install a flange-to-flange connection via a reasonable and more cost-efficient alternative method. S&WB rejected this proposal.

A review of the record shows conflicting evidence was presented to the district court, and it found TKTMJ's witnesses and evidence more credible. We cannot say the district's ruling was clearly erroneous. *See Pizzeck v. Executone Sys. Co. of Louisiana*, 411 So.2d 1202, 1204-05 (La. App. 4th Cir. 1982)(citation omitted)("The trier of fact should assess the credibility of experts who testify at the trial, as well as that of lay witnesses, to determine the most credible and realistic evidence and the fact finder's determination of the credibility of those witnesses will not be disturbed unless found to be clearly erroneous."). Thus, we conclude that the district court did not err in awarding additional costs, delay days, and delay damages.

*Overhead Service Extension*

Before TKTMJ could begin startup of the station, Entergy informed TKTMJ that an additional extension of the overhead service needed to be installed by TKTMJ; a power line needed to be brought from the station to the street. On May 10, 2016, TKTMJ submitted a change order request for installation of the overhead service to S&WB, which was approved. It was installed on May 24, 2016, by TKTMJ's subcontractor, and the power was connected by Entergy on May 31, 2016.

Mr. Wentz opined that the extra work for installation of the extended overhead service resulted in startup and testing of the station being delayed 22 days.

S&WB contends TKTMJ is not entitled to delay damages for installation of the extended overhead service because written notice of the impact of the delay was not submitted. Alternatively, S&WB argues there was no delay because the additional work did not impact the critical path.

Based on the evidence presented at trial, Entergy requested this additional work that resulted in the delay. Under the contract, TKTMJ was required to submit an impact analysis to the Engineer[23] illustrating the influence of this change or delay to the completion date to be entitled to an extension of the completion date of the contract and delays damages.[24] The record does not support that TKTMJ did so. Thus, the extension of the completion of the contract is reduced 22 days, and the award for delay damages is reduced by $22,337.62 (22 days x $1,015.3463).[25]

Because we find the notice requirement was not met, S&WB's assertion that TKTMJ is not entitled to delay damages because the additional work did not impact the critical path is moot.

*Added Expansion Joint*

S&WB requested TKTMJ to add and install two new expansion joints on the suction lines. Mr. Bergeron testified that "[w]e had asked the contractor for this, this job, and all the other jobs to add an expansion joint, it is basically a flexible

---

[23] See footnote 11.

[24] See Special Specifications 2-30(E) discussed *infra*.

[25] See footnote 6.

joint that allows us to remove a piece of some of these pipe fittings without it being a rigid connection . . . ."

Mr. Wentz attributed 16 compensable delay days for TKTMJ installing two expansion joints. Mr. Wentz stated that it caused a 16-day delay to startup, explaining that S&WB would not allow TKTMJ to proceed with the station startup and performance testing until this work was completed.

S&WB countered that any delay in startup was caused by the repair due to the misalignment in the piping of the dry well wall that was the fault of TKTMJ; thus, TKTMJ is not entitled to delay damages[26] and additional costs in the amount of $18,123.41 for the added expansion joints.

The district court, in its reasons for judgment, classified the installation of the expansion joints as additional work and awarded costs to TKTMJ. The district court was silent as to the delays for this additional work, but the record supports a finding that TKTMJ was given credit for the delay by the district court.

Since S&WB ordered this extra work, we find no written notice was required by TKTMJ under the contract.

In addition, applying the manifest error standard, we conclude it was reasonable, based on Mr. Wentz's expert testimony, that the district court found the delay was a result of the actions of S&WB. Thus, the district court did not err in awarding TKTMJ costs, delay days, and delay damages for installation of the expansion joints.

---

[26] See footnote 6.

**Dodt Station**

Mr. Wentz concluded that TKTMJ was entitled to direct cost changes for the Dodt Contract in the amount of $309,813.07. In addition, Mr. Wentz opined that TKTMJ was entitled to 574 compensable delay days, an extension of 574 days of the completion date of the contract, and delay damages in the amount of $545,688.23.[27] S&WB complains of two of the tasks included in Mr. Wentz's analysis for delay damages:[28]

| | |
|---|---|
| Redesign of Temporary Restraining Structure ("TRS") | 10 calendar days |
| Injection of dry well wall | 135 calendar days |

*Redesign of TRS*

In May 2014, a problem arose with the proposed building plans for the Dodt Station, and TKTMJ notified S&WB of the problem. While DEI[29] redesigned the plans for the Dodt Station, S&WB suspended the work. During this time, TKTMJ provided the bypass pumps for the station.

Following the redesign of the Dodt Station, no TRS design was included in the new plans for the Dodt Station. Mr. Lumpkin testified that when the design for the Dodt Station changed, a redesign of the TRS was required as one was not included in the redesign. TKTMJ and S&WB went back and forth over which party should be responsible for the design of the TRS. In the end, TKTMJ hired an engineering firm to design the TRS, and S&WB agreed to the design. Mr. Wentz

---

[27] See footnote 6.

[28] Other additional costs and delays were included by Mr. Wentz but are not discussed or challenged by S&WB.

[29] See footnote 11.

opined that TKTMJ was entitled to 10 compensable delay days due to the redesign of the TRS.

S&WB counters that TKTMJ was at fault for the delay. S&WB argues that TKTMJ "failed to specify a sheet pile size that [TKTMJ's] own subcontractor . . . could drive into the ground" and "[t]hat is why the TRS had to be redesigned and was the sole cause of the delay."

The district court found that the revised plans for the Dodt Station did not include "an engineered design for the restraint method," and S&WB required TKTMJ to include such a design, which findings are supported by the record. The district court concluded failure of S&WB to provide the design was a breach of the Dodt Contract.

As the TRS redesign was additional work required by S&WB, we find the notice requirement under the contract was not triggered.

Further, applying the manifest error standard, we conclude that the district court did not err in finding S&WB was at fault for the delay and awarding TKTMJ delay days and delay damages for the TRS redesign.

*Injection of dry well wall*

On October 27, 2015, S&WB sent a letter to TKTMJ, as formal notice that there was water intrusion occurring through the walls of the Dodt Station, and S&WB requested TKTMJ "promptly submit a method of remediation" to be approved by S&WB and DEI.[30] Construction Solutions, LLC, was hired to perform a Ground Penetrating Radar ("GPR") survey of the dry well wall. After the results, TKTMJ submitted a proposal, which was accepted by S&WB to perform the same repair procedures as it had at Plum Orchard Station; the dry well

---

[30] See footnote 11.

25

walls were injected with resin or epoxy grout (Python) injection beginning on March 2, 2016, and ending on March 9, 2016.

Mr. Wentz concluded there were 135 compensable delay days because the S&WB required TKTMJ to inject the dry well wall with waterproofing material, adding costs, in the amount of $11,372.43.

The district court found that this was "additional work" that S&WB requested TKTMJ to perform. We agree. As such, we find S&WB's assertion that written notice was required under the contract for TKTMJ to recover delay damages lacks merit.

Next, S&WB contends the request for the additional work was due to the fault of TKTMJ; thus, TKTMJ is not entitled to costs and delay damages. Alternatively, S&WB asserts even if TKTMJ is entitled to delay damages, the evidence reflects only a 21-day delay.

We agree TKTMJ is entitled to only a 21-day delay. TKTMJ's project manager, Mr. Lumpkin, testified that while remediation work, injecting of the walls, was being submitted, approved, and implemented, TKTMJ continued to do work within the dry well. Mr. Lumpkin gave examples of the work which included installing pumps, suction lines from the dry well to the wet well, discharge lines and "[a]nything that was not associated with the structure itself." He was of the opinion that there was a 21-day delay "from the time of the injection to the time it was completed and we were able to start with painting and surface structures."

Applying the manifest error standard, we conclude, based on the testimony of Mr. Lumpkin, the district court erred in awarding delay days and delay damages beyond the 21-day delay. Thus, the extension of days for completion of the Dodt

Contract is reduced by 114 days and TKTMJ's award for damages is likewise reduced by $142,406.52.[31]

*McCoy sewer line*

S&WB asserts the district court erred in awarding costs for the busted McCoy sewer line. Mr. Wentz opined repair of the McCoy sewer line was additional work, and TKTMJ incurred additional costs in the amount of $26,748.15.

S&WB argued that it was not responsible for the additional costs because during construction of the TRS at the Dodt Station, one of TKTMJ's subcontractors drove a sheet pile that was not part of the approved TRS design, piercing the sewer line. In addition, S&WB claimed that TKTMJ did not attempt to determine the exact location of the McCoy sewer line, although the contract and specifications required TKTMJ to determine "the exact location, depth and size of all underground utilities and structure."

Conversely, TKTMJ asserted that the busted sewer line was a result of the sewer line not being located in the place where it was shown on the project plans. Mr. Tubre testified that "[t]he starter piles for the pile driving system conflicted with an existing sewer line which was shown on the plans to be in a different location." Mr. Lumpkin testified the sheet pile was not part of TRS design, and Mr. Wentz agreed. The district court concluded it constituted additional work.

Review of the record shows conflicting evidence was presented to the district court, and it found TKTMJ's witnesses and evidence more credible. We

---

[31] The difference between the initial award of delay damages for the injection of the walls at the Dodt station of 135 days @ $1,249.18 ($168,639.30) minus 21 days @ $1,249.18 ($26,232.78) the delay damages in which TKTMJ was entitled. See footnote 7 for applicable daily burn rate.

cannot say the district's ruling was clearly erroneous. *See Pizzeck,* 411 So.2d at 1204-05. Thus, we conclude that the district court did not err in awarding TKTMJ the additional costs incurred for the repair.

*Weather Delay for Plum Orchard and Dodt Stations*

Mr. Wentz calculated TKTMJ was entitled to non-compensable delay days for adverse weather—22 days for Plum Orchard Station and 9 days for Dodt Station. Mr. Wentz explained the calculation was determined by looking at NOAA[32] reports over a ten-year period. He stated that the industry standard was if rainy days (more than .1 inch of rain), exceeded the norm or average number of rainy days based on a ten year average, TKTMJ should be given an extension of days to complete the contract for those excessive adverse weather days. Mr. Wentz noted that the contracts between S&WB and TKTMJ were silent as to how excessive adverse weather days would be counted. Mr. Wentz admitted he did not have TKTMJ's daily reports indicating whether TKTMJ worked on those adverse weather days.

S&WB asserts the district court erred in extending the completion dates of the contracts due to adverse weather days.[33]

First, we find S&WB's argument that TKTMJ's failure to give it written notice of the impact of the adverse weather delays to allow an extension of the completion date of the contracts lacks merit. We find no notice requirement as the contracts were silent as to adverse weather delays.

---

[32] National Oceanic and Atmospheric Administration.

[33] S&WB argues that that the district court, as part of its judgment, erred in finding that TKTMJ was entitled to extensions of time for completion of the contracts due to adverse weather. The district court did not specifically address a delay for adverse weather; but a review of the record, particularly the expert opinion of Mr. Wentz, reflects that TKTMJ was given credit for these days.

Second, S&WB argues that the district court erred in relying on Mr. Wentz's opinion that TKTMJ was entitled to non-compensable delay days for the adverse weather days. S&WB points out Mr. Wentz failed to confirm if TKTMJ had worked on those days. We agree. "If the opinion [of an expert] is based upon facts not supported by the record, the opinion must be rejected." *Schlesinger v. Herzog,* 95-1127, p. 15 (La. App. 4 Cir. 4/3/96), 672 So.2d 701, 711 (citing *Thomas v. Petrolane Gas Service Ltd. Partnership,* 588 So.2d 711, 719 (La. App. 2d Cir. 1991)). Although Mr. Wentz opined that, based on the industry standard, TKTMJ was entitled to non-compensable adverse weather delay days, Mr. Wentz admitted he did not have TKTMJ's daily reports to determine if TKTMJ worked on those adverse weather days. No evidence was submitted by TKTMJ to support that those adverse weather days impacted the critical path of the work. Applying the manifest error standard, we find the district court erred in allowing those non-compensable delay days. Thus, the extension of days for completion of the Plum Orchard Contract is reduced by 22 days, and the Dodt Contract is reduced by 9 days.

**Liquidated Damages**

S&WB asserts the district court erred in failing to award it liquidated damages.[34]

---

[34] In *James Const. Grp., L.L.C.,* 07-0225, pp. 12-13, 977 So.2d at 997-98 (footnote omitted), the first circuit explained:

> The purpose of a stipulated damages clause is to fix the measure of damages in advance and to constrain the timely performance of the principal obligation. It is not necessary for the plaintiff to show pecuniary or other actual damage to enforce the clause. La. C.C. art. 2009; *Utley-James of Louisiana, Inc. v. State, Division of Administration, Department of Facility Planning and Control,* 94-2504, p. 6 (La. App. 1st Cir.10/6/95), 671 So.2d 473, 476. The stipulated amount replaces the need for damages to be determined by the court. *Lombardo v. Deshotel,* 94-1172, p. 6 (La. 11/30/94), 647 So.2d 1086, 1090.

Before we turn to the merits of S&WB's claim for liquidated damages, we first address S&WB's contention that the completion date of the contracts determined by the district court was erroneous. S&WB asserts that its right to liquidated damages continued until January 9, 2017, the date TKTMJ tendered the Plum Orchard and the Dodt Stations to S&WB, and the sewerage stations were available for occupancy. S&WB argues:

> Plum Orchard and Dodt were both started and tested in the summer of 2016. Thereafter, significant work remained undone. The record shows that in October 2016 TKTMJ received extensive punch lists for the stations identifying approximately 200 different items that had not been completed. The record likewise shows that TKTMJ had not installed replacement parts on the station's pumps by that time. TKTMJ continued to work on the stations until at least January 9, 2017, the date on which it turned the stations over to the S[&]WB. Until that time, TKTMJ maintained the stations and kept them locked, and the S[&]WB was unable to access the stations without TKTMJ's permission. Only *after* the stations were turned over on January 9, 2017 was the S[&]WB able to occupy them; after that date, its employees began working at the stations three days a week. (footnotes omitted).

Mr. Manginelli, S&WB's expert, opined that based on his interpretation of the contract, liquidated damages stopped running on the date all work was completed "including repair damages, public and private property, clean up and punch list," which was January 9, 2017. Mr. Manginelli admitted he did not take into account S&WB's failure to extend the times set for starting and completing the contract. In addition, he agreed that generally substantial completion was the time at which the project could be used for its intended purpose.

---

However, courts may modify stipulated damages if they are so manifestly unreasonable as to be contrary to public policy. La. C.C. art.2012; *Lombardo,* 94-1172 at p. 6, 647 So.2d at 1090. Nevertheless, because a stipulated damages clause gives rise to a presumption that the obligee has suffered loss due to the failure to perform, the obligor bears the burden of defeating that presumption. See La. C.C. art. 2009, Revision Comment (d); Saul Litvinoff, 6 *Louisiana Civil Law Treatise,* Obligations § 13.16, 405 & § 13.18, 408 (West 1999).

Mr. Tubre, in contrast, testified that on July 14, 2016, the Plum Orchard Station was able to and was pumping sewage, its intended purpose, and the bypass pumping had been disconnected. He continued that on August 2, 2016, the Dodt Station was pumping sewage, its intended purpose, and the bypass pumping had been disconnected. Mr. Tubre admitted that the keys of the two stations were turned over to S&WB on January 9, 2017. He explained prior to that time, the stations were pumping as intended, and TKTMJ was working on the punch list items. TKTMJ points out that there was no testimony that S&WB was denied access to the stations, as section 2-37 of the specifications of the contracts required S&WB "have full access to and full use of the existing utilities during the entire period of construction . . . ," and TKTMJ "shall at all times provide proper facilities for access and inspection of the work by the Board, the Engineer. . . ."

The district court found that "[u]nder Louisiana law, S&WB's right to liquidated damages ceased on the date that TKTMJ's work under the Dodt and Plum Orchard Contracts was 'substantially complete'; and (ii) the sewerage stations built by TKTMJ were 'tendered and available for occupancy' by S&WB," quoting *State of Louisiana* v. *Wilco*, 393 So.2d 885, 899 (La. App. 4th Cir. 1981). The district court defined substantial completion as set forth in La. R.S. 38:2241.1 as "the finishing of construction, in accordance with the contract documents as modified by any change orders agreed to by the parties, to the extent that the public entity can use or occupy the public works or use or occupy the specified area of the public works for the use for which it was intended. . . ." It concluded the intended use, pumping sewerage, "indisputably occurred on the dates set forth by and proven by TKTMJ at trial: on July 15, 2016, and August 2, 2016." The district court acknowledged these dates were beyond the initial 365 days allowed for each

31

project, but despite each project suffering substantial delays, "S&WB never once granted a single extension of time to TKTMJ—even when S&WB acknowledged that the delays were the fault of S&WB and/or its agents."[35]

In *O & M Const., Inc. v. State, Div. of Admin.*, 576 So.2d 1030, 1035 (La. App. 1st Cir 1991)(footnote omitted), the appellate court explained in pertinent part:

> Under Louisiana law, a building contractor is entitled to recover the contract price even though defects or omissions are present when he has "substantially performed" the building contract. "Substantial performance" . . . means that the construction is fit for the purpose intended despite the deficiencies. This is a factual determination to be made by the trial court. Factors bearing on this factual determination include: the extent of the defect or non-performance, the degree to which the purpose of the contract is defeated, the ease of correction, and the use or benefit to the owner of the work performed. *Airco Refrigeration Service, Inc. v. Fink,* 242 La. 73, 134 So.2d 880 (1961); *Orgeron v. Dobkowski,* 476 So.2d 458 (La. App. 1st Cir.1985); *Anderson v. Green,* 454 So.2d 200 (La. App. 1st Cir.), *writ denied,* 459 So.2d 539 (La. 1984). The burden of proving substantial performance is on the contractor trying to recover the balance due on the contract. *Huguet v. Musso Partnership,* 509 So.2d 91 (La. App. 1st Cir.), *writ denied,* 512 So.2d 462 (La.1987).

Applying the manifest error standard, we conclude that TKTMJ met its burden and the record supports the district court's finding that substantial performance was completed and tendered to S&WB as to the Plum Orchard Station, July 15, 2016, and as to the Dodt Station, August 2, 2016.

Turning to S&WB's assertion it is entitled to liquidated damages, we find it has merit.

As discussed *supra*, the contracts between S&WB and TKTMJ obligated TKTMJ to pay liquidated damages in the amount of $500 per day, for each day

---

[35] The district court noted S&WB issued a certificate of completion for Plum Orchard Station on April 6, 2017 and for Dodt Station on April 18, 2017.

beyond the completion date of the contract. TKTMJ was not to be charged liquidated damages if the delay was due to unforeseeable causes beyond its control without "fault or negligence on [its] part." However, the relief was contingent on TKTMJ notifying S&WB in writing, of the causes of the delay within seven (7) consecutive calendar days after the beginning of such delay. . . ." In addition, S&WB had discretion to extend the time to start and complete the contract. (General Provisions (29); Special Specifications 2-09).

The Engineer[36] issued the work order for both stations on January 6, 2014. The Plum Orchard Station start date was January 6, 2014, with a completion date of January 6, 2015. The Dodt Station start date, as acknowledged by S&WB, due to a 45-day delay, was February 19, 2014, with a completion date of February 19, 2015.

As to the Plum Orchard Station, Mr. Wentz opined that TKTMJ was entitled to an extension of 495 calendar days from the original completion date, January 6, 2015. However, as discussed *supra*, Entergy required TKTMJ to install the extended overhead service, and although TKTMJ provided S&WB a change order for the installation, the record does not reflect it provided S&WB with a time-impact analysis, requesting an extension of the completion date of the contract. The record does not reflect TKTMJ complied with the contract by notifying S&WB in writing of the "causes of the delay" to avoid paying liquidated damages for this delay.[37] In addition, TKTMJ, as discussed *supra*, failed to prove it was entitled to 22 non-compensable day delay for adverse weather days. After subtracting the 22-day extension for the overhead service installation and 22-day

---

[36] See footnote 11.

[37] See General Provision (26) discussed *supra*.

33

extension for the adverse weather days erroneously credited to TKTMJ, TKTMJ was entitled to a 451-day extension of the completion date of the Plum Orchard Contract.  As a result, the completion date should have been April 1, 2016, 105 days short of the completion date of July 15, 2016.  TKTMJ is responsible for the 105-day delay past the completion date at $500.00 a day, for a total of $52,500.00.  The district court erred in failing to award liquidated damages under the Plum Orchard Contract to S&WB in the amount of $52,500.00.

Turning to the Dodt Station, Mr. Wentz testified that TKTMJ was entitled to a 574-day extension from the original completion date of February 19, 2015.  As discussed *supra*, TKTMJ is entitled to only a 21-day extension, instead of a 135-day delay for the injection of the Dodt Station dry well walls.  The record does not reflect TKTMJ complied with the contract by notifying S&WB in writing of the "causes of the delay" to avoid paying liquidated damages for this 114-day delay.[38]  In addition, TKTMJ, as discussed *supra*, failed to prove it was entitled to 9 non-compensable day delay for adverse weather days.  Thus, the number of days for extension of the completion date of the Dodt Contract is reduced to 451 days, and the completion date should have been May 15, 2016.  From May 15, 2016, to the substantial completion date of August 2, 2016, for the Dodt Station, there was a difference of 79 days.  TKTMJ is responsible for the 79-day delay past the completion date at $500.00 a day, for a total of $39,500.00.  The district court erred in failing to award liquidated damages under the Dodt Contract to S&WB in the amount of $39,500.00.

---

[38] See General Provision (26) discussed *supra*.

## CONCLUSION

We reverse the district court's judgment, in part, amend it in part, affirm it as amended, and render judgment as follows:

1. S&WB is awarded liquidated damages in the amount of $92,000.00 to be paid by TKTMJ and Travelers;

2. the total damages award to TKTMJ is reduced by:

   a. $22,337.70 (which was improperly awarded to TKTMJ by the district court for installation of the overhead service at Plum Orchard Station); and

   b. $142,406.52 (the difference between the initial award of delay damages for the injection of the dry well wall at the Dodt Station minus the delay damages TKTMJ was entitled for the delay).[39]

3. the judgment is amended to award TKTMJ total damages in the amount of $1,555,064.02 to be paid by S&WB;[40]

   **REVERSED IN PART, AMENDED IN PART, AFFIRMED AS AMENDED, AND RENDERED**

---

[39] The difference between the initial award of 135 delay days @ $1,249.18 ($168,639.30) and the delay TKTMJ was entitled, 21 delay days @ $1,249.18 ($26,232.78).

[40] The initial total award by the district court, $1,719,808.24 -$164,744.22 (total amount of the reduction of the award) = $1,555,064.02.